**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BETTER PATH COALITION PLANNING GROUP, an unincorporated association; and KAREN FERIDUN,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF HARRISBURG; and Hon. WANDA R. D. WILLIAMS, Mayor, City of Harrisburg,**<br><br>**Defendants.** | **Case No. 1:22-cv-00623** |

## AMENDED COMPLAINT

## INTRODUCTION

1. Plaintiffs are a coalition of climate activists who host the annual Climate Convergence in Harrisburg, a family- and child-friendly event designed to raise awareness about climate change.

2. Regrettably, Defendant City of Harrisburg ("the City") has interfered with Plaintiffs' core First Amendment activities by seeking to impose an ever-changing laundry list of conditions on the Climate Convergence, none of which

can be traced to any law or ordinance setting forth "narrow, objective, and definite standards" governing the issuance of event permits in Harrisburg. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). At various points, the City has insisted that Plaintiffs pay expensive fees and user costs, procure insurance coverage that is inextricably correlated with the coalition's message, agree to substantially overbroad indemnification and hold-harmless provisions, and comply with other assorted demands as a precondition for using the City's traditional public forums, including Riverfront Park and the streets leading to the Pennsylvania Capitol Building. Yet none of these requirements are codified in any law, ordinance, or regulation.

3. Municipalities have long been allowed to impose limited regulations for use of traditional public forums, but these regulations must comply with the First Amendment. Permitting laws must a) not delegate overly broad licensing discretion, b) be content neutral, c) be narrowly tailored to serve a significant governmental interest, and d) leave open ample alternatives for communication. *Id.* at 130 (citing *United States v. Grace*, 461 U.S. 171, 177 (1983); *Freedman v. Maryland*, 380 U.S. 51 (1965); *Cox. v. New Hampshire*, 312 U.S. 569, 574-76 (1941)). The City of Harrisburg's patchwork approach is suffused with standardless discretion, content-based distinctions, vague language, and

overbreadth. It therefore suffers from numerous fatal First-Amendment flaws, making it unconstitutional both on its face and as applied to Plaintiffs.

4. Unlike nearly every municipality in America, the City of Harrisburg still does not have a comprehensive permitting ordinance to regulate use of traditional public forums like City streets. The City's current ordinances regulate only use of public parks, but even the parks provisions lack sufficient detail for organizers and demonstrators to determine what is required of them when seeking to use public property for traditional First Amendment-protected activity. When event organizers seek guidance on permitting requirements from City officials, they are directed to a handful of internal City documents—many of which are unpublished, lack clarity, are often in conflict with each other, and were never formally promulgated by the City's legislative or executive rule making processes. This impenetrable patchwork approach is riddled with gaps and plagued by vague language that effectively leaves government officials and municipal employees with standardless discretion to regulate use of the City's streets, squares, and other such traditional public forums. Such standardless discretion is anathema to the First Amendment because it invites arbitrary and discriminatory enforcement. Plaintiffs' experiences with the process over the past two years illustrate how

Harrisburg's system is unworkable, and why they must develop a formalized permitting scheme.

5. Plaintiffs filed this suit in 2022 to overcome arbitrary, unreasonable and oppressive conditions the City sought to impose on their peaceful demonstrations, and to fix the constitutional deficiencies in the City's haphazard permitting approach, which likely has impeded and will impede others wishing to use public spaces in Harrisburg. In nearly two years since then, the constitutional problems have persisted, confirming the initial constitutional concerns that led to the filing of this lawsuit. Despite Plaintiffs' attempts to work with the City in devising a comprehensive ordinance with content-neutral time, place and manner provisions to regulate demonstrations in public spaces, the City still has not amended, supplemented, or revised its deficient permitting scheme. Indeed, the City *still* has *no* ordinance or regulation addressing the public's use of City streets.

6. And when Plaintiffs attempted to plan the 2023 Climate Convergence during the stay of this litigation, City officials again exercised the unbounded discretion its approach inheres to insist on many of the same unenumerated and unconstitutional conditions that triggered this litigation. Ultimately, the City's handling of Plaintiffs' 2023 application forced Climate Convergence organizers to

abandon their plans to exercise their First Amendment rights in City-controlled public forums. They moved to the Capitol, where events unfolded without incident.

7. Faced with the City's refusal to correct the glaring legal problems in its current patchwork approach, Plaintiffs re-start this litigation to seek injunctive relief before the 2024 Climate Convergence and a declaration that the City's standardless system violates the First Amendment.

8. Plaintiffs ask this Court to declare that the City's present permitting approach is unconstitutional and to enjoin its enforcement in connection with any and all future First Amendment-protected events in any City-controlled public forum. Plaintiffs further seek an injunction ordering the City, once and for all, to adopt and implement a comprehensive permitting ordinance or regulation with content-neutral time, place, and manner standards to City-controlled public forums.

## JURISDICTION

9. Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate rights protected by the First and Fourteenth Amendments to the United States Constitution. The Court has jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). This Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

## PARTIES

10. Plaintiff BETTER PATH COALITION PLANNING GROUP represents an unincorporated association of nearly forty statewide frontline and grassroots-led organizations that advocate for a clean, renewable-energy future for Pennsylvania and a government that puts the interests of people before the fossil-fuel industry. The leaders and founders of these organizations are private citizens and lay volunteers, many of whom took up advocacy work out of necessity because they have been victimized by environmental disasters. Their ability to plan and run events depends on grassroots fundraising. A list of member organizations is attached as Exhibit 1. Through those fundraising efforts, BETTER PATH COALITION PLANNING GROUP sponsors the Climate Convergence, a gathering of climate activists and members of the public each year in Harrisburg.

11. Plaintiff KAREN FERIDUN is a member of BETTER PATH COALITION PLANNING GROUP and a lead organizer of the Climate Convergence. She is a resident of Berks County, Pennsylvania.

12. Defendant CITY OF HARRISBURG ("City") is a political subdivision organized as a City of the Third Class under the laws of Pennsylvania. *See* 53 Pa. Stat. Ann. §§ 41101-41625.

13. Defendant Hon. WANDA R. D. WILLIAMS is Mayor of the CITY OF HARRISBURG. As Harrisburg's highest ranking elected official, Mayor Williams is vested with executive power. *See* 53 Pa. Stat. Ann. § 41411. As such, she is responsible for ensuring that the City's public spaces are available for public uses consistent with the U.S. Constitution. At all times hereafter mentioned, Mayor Williams was acting under color of state law. She is sued in her official capacity.

## FACTS

14. The Better Path Coalition Planning Group organizers selected Harrisburg to host the Climate Convergence because it is the Commonwealth's seat of power, and many public officials with the authority to address climate change have their business offices in the City. The Convergence is a "diverse, inclusive, peaceful gathering organized to demand urgent action by our government to address the climate crisis." *See About Us*, PENNSYLVANIA CLIMATE CONVERGENCE, https://www.pennsylvaniaclimateconvergence.org/ (last visited Feb. 2, 2024).

15. Plaintiffs want all Convergence events to be peaceful and law-abiding. They also want participants to feel safe, especially the families with young children who want to participate in demonstrations that could encounter traffic if adequate

controls are not in place. Accordingly, Plaintiff Feridun began working to secure permits and attempted to navigate the various requirements and guidelines imposed by City and state government entities.

16. Plaintiff Feridun's initial research revealed that three different government agencies had jurisdiction over the public forums they hoped to use during the 2022 Climate Convergence demonstrations:

a. the Capitol Police, which are part of Pennsylvania's General Services Administration, regulate demonstrations at the Capitol Building and regulate Commonwealth Ave.;

b. the Pennsylvania Department of Transportation ("PennDOT") regulates some of the roads along the 2022 Climate Convergence march route; and

c. the City regulates use of Riverfront Park and several roads on the 2022 Climate Convergence march route not governed by PennDOT.

17. Plaintiff Feridun discovered that all three agencies imposed what she believed were unconstitutional restrictions on the use of traditional public forums. With the help of undersigned counsel, Plaintiffs were able to work with counsel for PennDOT and the Capitol Police to alter their processes to allow the Climate Convergence to proceed in those spaces. Unfortunately, Plaintiffs were unable to overcome their disputes with the City, prompting this lawsuit.

**The City of Harrisburg's Patchwork of Inadequate and Unwritten Permit Conditions**

18. Harrisburg's City Code contains only one ordinance that arguably applies to use of public spaces for expressive activities. Section 10-301.20 of the City's Code dictates that certain groups must obtain a permit to use city parks. A copy of the Code provision is attached as Exhibit 2. It states that permits may be granted "upon such reasonable conditions as deemed appropriate." Ex. 2 at § 10-301.20 (A)(2). However, Section 10-301.20 contains no reference to fee schedules, insurance, or indemnity requirements.

19. The City has no other ordinance governing the use of other traditional public forums, such as City streets and sidewalks. The City has no law that even discusses how and when people can use these public spaces and under what conditions and restrictions. While the Supreme Court has endorsed municipalities' ability to impose reasonable and content-neutral time, place, and manner restrictions on public uses, *see, e.g.*, *Forsyth*, 505 U.S at 130-31, Harrisburg has "no articulated standards" to guide officials or citizens, *id.* at 133.

20. Harrisburg has no ordinances or regulations meant to regulate applicable fees, timelines, competing uses of public forums, or other such topics typically found within a municipality's public forum permitting system. Absent

promulgated rules, government officials are free to make up the rules as they go along, allowing and inviting arbitrary and discriminatory application and enforcement. And civilians seeking to use public spaces have no clear guide for how to go about getting permission to stand in the middle of a street with signs or block sidewalks to express their views on matters of public concern.

21. Absent any duly promulgated law to regulate demonstrations in public streets, and no promulgated guidelines to regulate fees, insurance, or indemnification requirements in any traditional public forum, City employees and officials effectively have unbridled discretion to decide who gets to use public spaces and on what terms.

22. Indeed, the City's response to Plaintiffs' claims in this lawsuit indicate that it does not always impose the requirements officials sought to impose on the Climate Convergence. (*See* Defs.' Resp. to Pls.' Mot. for Prelim. Inj., ECF No. 26 at 10.) Defendants suggest that the City would not require permits for spontaneous marches and demonstrations, but in the absence of any law, ordinance, or regulation spelling out when permits are required, City employees and officials were left with unbridled discretion to effectively punish Plaintiffs for pre-planning their event and impose a laundry list of onerous costs and other requirements not imposed on other event organizers.

23. In response to Plaintiffs' inquiries leading up to the 2022 Climate Convergence, Harrisburg gave Plaintiffs three documents that purport to regulate use of public forums. Their provenance and historical application are not readily ascertainable, but they are not ordinances passed by the City council or executive regulations that went through any recognizable rule-making process.

24. A document entitled, "Special Event Permit Procedures" (attached as Exhibit 3), defines "special events" as "any event requesting to close access to a public street that does not fall under the Block Party Permit / Moving Truck Permit definitions." It also includes, among other things, the following:

a. A requirement that applicants submit a permit application "no less than 60 days before the event" and "no less than 90 days before the event" if "State roads" are involved, as in the case of the Climate Convergence, with no exceptions for emergent political demonstrations;

b. Paragraph 3 requires a "traffic control plan" and references a mandatory "service fee"; and

c. The reverse side of the two-page form discusses the "Approval Process" and references required fees for traffic control and staffing, but provides no fee scale and no guidelines or standards for estimating the amounts of these fees.

25. A second document is titled, "Application for Special Event Permit" (attached as Exhibit 4). This document specifies additional conditions, including:

a. A requirement that the applicant notify businesses and residents in the area of the event at least 30 days beforehand;

b. A requirement that the applicant pay some unidentified amount to "rent any metered parking spaces that will not be accessible during the event"[1];

c. A statement that the requesting party "shall be liable for any loss, damage, or injury sustained by any person or by the City resulting from the activity for which the permit has been issued for this purpose";

d. A requirement to provide a "Certificate of Insurance," proving coverage of $250,000 per person and $1 million per occurrence, although the document does not specify the type of insurance; and

e. A statement that, "All required fees must be paid prior to City Staff being scheduled for event," without specifying the amount of fees or how they will be calculated.

26. A third document, titled "Release and Waiver of Liability" (attached as Exhibit 5), seemingly applies to use of City parks, as it references "Park Permit" and approval by "Parks and Recreation staff." While there is no indication whether it applies to use of other public forums, like streets and sidewalks for

[1] The Application for Special Event Permit document specifically instructs the applicant to call "STANDARD PARKING" for details about parking space rental. Ex. 4. When Plaintiff Feridun called Harrisburg's Standard Parking department at the number identified in the document, the staff informed her that the per-space fee would be $44, but they did not disclose the number of spaces that would need to be rented at that rate and City officials were perplexed as to how this would work.

marches and demonstrations, this form includes the following problematic provisions:

a. One paragraph states that by submitting this Permit Application, "the applicant is certifying that no expense will be borne by the City of Harrisburg in connection with the event or activity described in this Application for which the City will not be fully reimbursed. Further, the applicant certifies that the City is not liable or responsible for any cost, effect, error, omission or loss of any kind associated with the event or activity listed herein, and that the City is fully indemnified and held harmless from any claims or judgments arising from such. All park permit activities must be fully insured by the applicant with the City named as an 'Additional Insured.' All facilities are rented in 'as is' condition."

b. Below that, the form states that, "[t]here are no waivers or reductions of any fees for any park."

c. A section headed, "PERMIT HOLDER RESPONSIBILITIES," reads: "If it is determined by the City that Police, DPRE staff, or other City personnel resources must be present to ensure the safe operation of your event, the Permitee [sic] must pay for all personnel and equipment costs. The city reserves the right to require such payment in advance."

d. A section titled, "INSURANCE REQUIREMENTS," specifies that applicants must sign a "Release and waiver of liability," show "proof of Personal Auto Liability Coverage for themselves and all others who plan on driving and parking on-site…", and events with an estimated audience of more than 51 people must meet the following insurance requirements (which notably conflict with insurance requirements for special events, noted previously):

    i. "Applicants must provide Event Liability coverage of $I,000,000 [sic] per occurrence and $ I,000.000 [sic]

aggregate ill [sic]: Standard Liability coverage of $1,000,000 per occurrence and $2,000,000 aggregate."

ii. "Applicants must provide Auto Liability of $1,000.000 Combined Single Limit for Corporations and $300,000 Combined Single Limit for individuals."

iii. "All insurance certificates shall be originals listing the City of Harrisburg as an Additional Insured. All certificates must be signed by a licensed insurance broker or insurance company representative. Sub limits shall not be less than the per occurrence limit amount required. If certificates are not received at least thirty (30) days prior to the event, the permit is not valid."

e. Finally, the form requires applicants to endorse the following provisions, among others:

i. "I hereby assume all risk and responsibility of damage to the property of the City of Harrisburg as it relates to my event and my use and/or misuse; and hod [sic] the City of Harrisburg, it's [sic] agents and representatives harmless for any and all suits relating to the use of City owned facilities."

ii. "I hereby fully and forever release, discharge, and agree not to sue the City of Harrisburg, and of [sic] their officials, elected or appointed, employees (past or present), and contractors/vendors(past or present), sponsors or their officers, directors, agents, employees [sic] representatives, and successors for any and all claims, causes of action or liability for any injury, loss or damage sustained or incurred by me or my guests arising our [sic] of or in any way associated with our attendance at or participation in my event through this contracted rental."

iii. "I hereby fully and forever release, discharge and agree not to sue the City of Harrisburg, any of their officials, elected

> or appointed, employees (past or present) and contractors/vendors (past or present), sponsors or their officers, directors, agents, employees [sic] representatives, and successors for any loss, damage or expense brought on by me, anyone acting on my behalf, or anyone else because of conduct attributed to me."

**City Officials Placed Unconstitutional, Mostly Unwritten, Permit Conditions on the 2022 Climate Convergence.**

27. All told, the forms provided by the City generated the following laundry list of problematic conditions that City officials initially sought to impose on Plaintiffs' 2022 permit requests:

a. Unspecified permit and "service fees" for both Riverside Park and the use of City streets;

b. Cost-shifting provisions requiring Plaintiffs to pay unspecified staffing and equipment costs for traffic control;

c. Unspecified rental fees for metered parking spaces;

d. Internally contradictory insurance requirements:

    i. One form requires insurance in the amount of $250,000 per person and $1 million per occurrence without identifying the type of insurance required; and

    ii. Another form specifies three different types of insurance – (i) $1 million in event liability coverage, *plus* (ii) standard liability coverage with a limit of $1 million per occurrence and $2 million aggregate limit, *plus* (iii) another $1 million of auto liability coverage;

e. Overbroad indemnification and waiver-of-liability requirements, including agreements to reimburse the City for *any* damage, harm and/or litigation, regardless whether actually caused by event organizers;

f. A 90-day advance-notice requirement for events involving State roads, with no exception for demonstrations involving emergent issues of public concern;

g. Responsibility to develop a traffic-control plan without any guidance as how to do so; and

h. A requirement to notify area residents and businesses, by going door-to-door, at least 30 days prior to the event.

28. No document shared by City employees with Plaintiff Feridun or produced in response to a Right-to-Know-Law request by her counsel included a schedule of fees and costs, or standards for imposing fees and insurance requirements.

29. Plaintiff Feridun carefully digested the "Special Event Permit Procedures," "Application for Special Event Permit," and "Release and Waiver of Liability" documents provided by City officials (Ex. 3-5 hereto). When she spoke to City representatives, they confirmed she would have to comply with all requirements set forth in those forms, with the exception of the auto insurance provision, in order to get approval for the festival and the march.

30. However, Plaintiffs' initial attempts to purchase the requisite insurance failed because carriers simply were unwilling to underwrite events of this type. As a result, Plaintiffs were uncomfortable with the overbroad indemnification responsibilities, which made them liable for damage and costs beyond their control. The fees and costs were uncertain and estimates were too high for a low-budget coalition. And the requirements to notify nearby residents and businesses and develop traffic-control plans were beyond Plaintiffs' capabilities.

31. On March 31, 2022, undersigned counsel sent a letter to Mayor Williams identifying numerous constitutional deficiencies in Harrisburg's shambolic permitting process, and asked her to waive the costs and fees, insurance, indemnification, parking, and traffic-control requirements. A copy of the letter is attached as Exhibit 6.

32. After an exchange of communications with the City's solicitor, on April 24, 2022, the parties reached an impasse. While the City had informally waived the insurance and indemnification requirements for the march, they refused at the time to waive traffic-control fees or parking space rental for the march. The City also insisted on enforcing several requirements associated with the festival planned for June 11, 2022, in Riverfront Park, including a permit fee and the

requirement to obtain insurance for the festival. After months of unsuccessfully attempting to find a willing insurance carrier, Plaintiffs were only able to procure the required insurance from a carrier that the City recommended, at a rate of $917.

33. In all, the requirements initially imposed by the City would have cost Plaintiffs thousands of dollars, with the final tally for some fees still undetermined:

a. $610 in permitting fees for the festival at Riverfront Park, which the City informed Plaintiffs would have been $1,110 for a non-resident applicant; *plus*

b. $917 in insurance premiums for the one-day festival; *plus*

c. $480 in purported staffing fees for traffic control[2;] *plus*

d. $96 for a purported "equipment use fee" connected to the march[3]; *plus*

e. An estimated $44 *per parking space* for an as-yet undisclosed number of metered spaces located on the streets on Plaintiffs' march route.

---

[2] After some back and forth with city officials, the City quoted this amount to Plaintiff in an email from John Snedeker, Special Events Logistics Coordinator, on April 13, 2022. In the email, the City arbitrarily determined the number of personnel the City would deploy and for how many hours, yielding a fee of $480. A copy of the email is attached as Exhibit 7.

[3] In the April 13, 2022, email from John Snedeker, attached as Exhibit 7, the City tacked on this fee without explanation.

**The City Agreed to Issue Permits Pursuant to an Interim Settlement Agreement After Facing Litigation.**

34. After the filing of this litigation, and before the Court decided Plaintiffs' Motion for Preliminary Injunction, ECF Nos. 3, 4-1, the Parties entered into an Interim Settlement Agreement, ECF No. 33 in an attempt to resolve the current dispute. As part of the Interim Settlement Agreement, Defendants agreed to waive the following purported requirements and fees they had initially sought to impose before issuing a permit for the 2022 Climate Convergence:

a. The 90-day advanced notice requirement (*see* ¶ 24(a), *supra*);

b. The "traffic control plan" submission (*see* ¶ 24(b), *supra*);

c. The requirement to notify individual businesses and residents located along the planned march route (*see* ¶ 25(a), *supra*);

d. The $44 per-space rental fee for metered parking spaces (*see* ¶ 25(b), *supra*);

e. Additional insurance coverage for use of the City streets[4];

f. Additional police reimbursements[5]; and

---

[4] The City continued to insist that Plaintiffs obtain $1 million in event liability coverage and $2 million in standard liability coverage called for in the Parks and Recreation Release and Waiver of Liability form for use of Riverside Park on June 11, 2022 (*see* ¶ 26(d), *supra*), but waived the initial demand that Plaintiffs also obtain additional coverage ($250,000 per person and $1 million per occurrence) for the June 12 march on City streets (*see* ¶ 25(d), *supra*).

[5] The City continued to insist on payment of the $480 fee for traffic control personnel (*see* ¶ 33(c), *supra*), but waived in part the previous demand that

g. The broad indemnification, liability waivers, and assumption of liability agreements (*see* ¶ 26(a), *supra*).

35. This agreement effectively reduced the City's bill to $1,186, consisting of: (i) the $610 permit fee for use of Riverfront Park; (ii) the $480 traffic control personnel fee to close City streets; and (iii) the $96 "equipment usage fee" purportedly connected to traffic control for use of City streets.

36. Plaintiffs continued to dispute the propriety of all such charges. However, pursuant to the Interim Agreement, Plaintiffs deposited $1,186 into escrow pending the outcome of this suit. In addition, Plaintiffs acquired the requested insurance coverage for their use of Riverside Park during the 2022 Climate Convergence at a cost of $917. In exchange, Defendants approved Plaintiffs' pending permit applications without requiring any further permitting fees, costs or other charges, and all parties agreed to work together in good faith on a new permitting ordinance proposal that would satisfy Plaintiffs' constitutional concerns going forward.

37. As a result, the 2022 Climate Convergence took place without incident on June 11-13, 2022:

---

Plaintiffs agree to further cost-shifting (*see* ¶ 26(c), *supra*) that would have required them to reimburse the City for any police that may be dispatched to the Climate Convergence over and above those covered by the initial $480 fee.

a. On Saturday, June 11, Plaintiffs held a climate-themed festival of art, music, theater, talks, tabling and more at Harrisburg's Riverfront Park.

b. On Sunday, June 12, Plaintiffs held a "day of action," starting with an interfaith service at Riverfront Park, followed by a march led by children through downtown Harrisburg that passed by Pennsylvania agencies whose activities impact the climate, and concluded with a brief rally on the rear steps of the Capitol Building.

c. On Monday, June 13, participants installed a climate countdown clock and delivered a petition to elected officials in their offices at the State Capitol.

38. Throughout the remainder of 2022 and most of 2023, the parties held discussions pursuant to the Interim Settlement Agreement about proposed terms for a revised permitting ordinance and/or interim regulations to address permitting for use of City streets, sidewalks, and parks.

**The City's Failure to Address Persistent Problems with the Its Permitting Approach Forced Plaintiffs to Move the 2023 Climate Convergence away from City-Controlled Public Forums.**

39. During the interim settlement period, Plaintiffs began preparations for another Climate Convergence in 2023, which they had planned for October 1-2, 2023.

40. No new ordinance or regulation had been passed, leaving in effect the same unconstitutional permitting approach that existed when this lawsuit was filed in 2022.

41. Like the 2022 Climate Convergence, Plaintiffs planned multiple demonstrations to express their views regarding the dangers of climate change and to advocate for action by those holding political office in Harrisburg.

42. Unfortunately, due to the City's refusal to enact clear, written policies and procedures regarding First-Amendment-protected protests and demonstrations, Plaintiffs again faced difficulty obtaining the necessary permits to conduct their demonstration. Plaintiffs spent *months* trying to navigate the impenetrable permitting requirements Defendants *again* sought to impose before issuing permits for the 2023 Climate Convergence.

43. By way of example, the City again sought to impose the following conditions on Plaintiffs' requests for permits in connection with the 2023 Climate Convergence:

a. $620 in permitting fees for the festival at Riverfront Park, which the City informed Plaintiffs would have been $1,110 for a non-resident applicant;

b. The same burdensome insurance requirements that the City attempted to impose for use of the parks in 2022; and

c. The same indemnification, liability waivers, and assumption of liability terms the City sought to impose for use of the parks in 2022.

44. While the City did not seek to impose each and every one of the unconstitutional conditions they tried to enforce on the 2022 Climate Convergence, it had not adjusted, amended, or supplemented the City's ordinances, regulations, or procedures. Thus, in 2023 as in 2022, the City's permitting requirements were unconnected to any duly promulgated law or regulation.

45. In addition, Plaintiffs encountered another example of the problems caused by standardless permitting schemes when they sought to hang banners on certain City utility poles, which apparently other organizations do regularly. Plaintiffs sought approval to have banners hung on poles along City-controlled streets where Plaintiffs wanted their message to be seen by certain Commonwealth agencies with offices on those streets.

46. However, the City used its vague and impenetrable permitting process to prevent Plaintiffs from posting banners advertising the 2023 Climate Convergence. While the City does actually have a Code provision that contemplates permits for affixing hanging banners to utility poles, the specific process for obtaining banner permits is unclear and inaccessible even to City officials. Section 7-325.10A(4) of the City's Planning and Zoning Code provides

for, "Temporary banners for 30 days which have received a permit from the Zoning Officer to advertise a public celebration or charitable event, but not a political campaign, cause or opinion and which are permitted to be attached to utility poles, bridges or other fixtures by the respective owner."

47. When Plaintiffs inquired with the City's Zoning Office about the process for acquiring permits under § 7-325.10A, the City's Planning Director initially responded on August 11, 2023, by referring Plaintiffs to a building permit form and stated that the permit would cost $25 for each banner.

48. While that fee is not referenced anywhere in the City's Code, any ordinance, or any published policy, Plaintiffs were prepared to pay this fee to obtain the permits needed to order and place their banners.

49. However, when Plaintiff Feridun attempted to contact the City's Zoning Office again to identify the specific City-controlled utility poles where Plaintiffs planned to place banners, the Planning Director stopped responding, and other City officials responded to Plaintiff Feridun's inquiries by referring her around to a variety of other irrelevant City offices, each of which told her that they could not help with permits for hanging banners. After weeks of trying to decipher the process for obtaining a permit pursuant to § 7-325.10A(4), Defendants told Plaintiffs in late September 2023 that the City simply does not issue permits for

hanging banners on City-owned utility poles. This response could not be reconciled with the fact that banners for a variety of events often appear on City-owned utility poles. But with little time to spare, Plaintiffs had to change their plans *again*, ordering disposable lawn signs to advertise the 2023 Convergence instead of the hanging banners.

50. Ultimately, when faced with many of the same challenges that resulted from the City's unwritten permit regulations the year before, Plaintiffs abandoned their plans to hold a festival in City-controlled public forums during the 2023 Convergence and opted for another venue not controlled by Defendants so they could plan their First Amendment activity without the City's burdensome and arbitrary conditions. Thus, as a result of the City's impenetrable permitting scheme, Plaintiffs were forced out of their chosen public forums.

51. Plaintiffs changed venues and hosted the 2023 Climate Convergence at a Capitol complex location because it is not controlled by the City. The reconstituted 2023 Climate Convergence took place without incident at the Capitol Complex on October 1-2, 2023.

52. Plaintiffs plan to hold another Climate Convergence in the City this year on October 20 and 21, 2024. *See* PENNSYLVANIA CLIMATE CONVERGENCE, https://www.pennsylvaniaclimateconvergence.org/ (last visited Feb. 2, 2024).

53. The consequence of not having an ordinance that regulates the many critical aspects of the permitting process—there is still no ordinance governing use of City streets and the Parks ordinance does not address insurance or fees, even though the City appears to regularly insist on them—is that Harrisburg relies on a classic prior restraint on core political speech in traditional public forums to interfere with and even deny people their constitutional right to demonstrate in these time-honored spaces.

54. Absent injunctive relief enjoining Defendants' enforcement of insurance, overbroad indemnification, fee-shifting, and other requirements for Climate Convergence events, Plaintiffs will continue to suffer irreparable harm for which there is no adequate remedy at law.

## CLAIMS

### Violation of the First Amendment to the United States Constitution

55. Defendants' informal and disjointed scheme for regulating use of the City's traditional public forums for expressive purposes is unconstitutional on its face and as applied, violating the First Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

56. First, Defendants' approval system for people wishing to use

traditional public forums for expressive purposes is a standardless prior restraint on Plaintiffs' freedom of speech, which violates the First Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

57. Second, the fee-shifting, insurance, indemnification, notice and traffic-control-plan requirements are content-based restrictions of speech that are presumptively unconstitutional under the First Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

58. Finally, the fee-shifting, insurance, indemnification, notice and traffic-control-plan requirements are fatally overbroad and not narrowly-tailored, which is a third fatal First-Amendment flaw in Harrisburg's permitting system.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs Better Path Coalition Planning Group and Karen Feridun respectfully request that this Court provide the following relief:

(a) Declare that Harrisburg's permitting scheme to regulate uses of the City's traditional public forums violates Plaintiffs' rights under the First and Fourteenth Amendments to the Constitution;

(b) Declare that Harrisburg's fee-shifting, insurance, indemnification, notice and traffic-control-plan requirements violate the First Amendment;

(c) Enjoin the City from enforcing the following requirements for demonstrations in traditional public forums:

(i) Insurance;

(ii) Indemnification;

(iii) Permit and service fees for use of public parks and roads;

(iv) Fee shifting for police, traffic or any other fees and costs; and

(v) Other requirements, such as paying for parking spaces, providing advance notice to nearby homeowners and businesses, and developing traffic-control plans.

(d) Order Defendants to present to Plaintiffs and the Court, within thirty (30) days, a proposed demonstration permitting ordinance that contains constitutionally required content-neutral time, place and manner regulations establishing objective conditions for use of Harrisburg's traditional public forums;

(e) Order that the escrowed funds, totaling $1,183 plus any accrued interest, be returned to Plaintiffs;

(f) Order Defendants to reimburse Plaintiffs in the amount of $917, plus interest, for their purchase of insurance coverage required to hold the 2022 Climate Convergence;

(g) Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(h) Grant such other relief as this Court deems just and appropriate.

Dated: February 2, 2024

Respectfully submitted,

*/s/* Stephen A. Loney, Jr.
Stephen A. Loney, Jr. (No. 202535)
Solomon Furious Worlds (No. 333677)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
sloney@aclupa.org
sfworlds@aclupa.org

Witold Walczak (No. 62976)
Richard Ting (No. 200438)
ACLU OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
P: 412-681-7864
vwalczak@aclupa.org
rting@aclupa.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing Amended Complaint, together with the accompanying Exhibits thereto, were filed electronically and served on counsel of record via the Court's CM/ECF system.

Dated: February 2, 2024

*/s/* Stephen A. Loney, Jr.
Stephen A. Loney, Jr.