IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BETTER PATH COALITION PLANNING GROUP and KAREN FERIDUN,** | : CIVIL ACTION NO. 1:22-CV-623 <br> : <br> : (Judge Conner) |
| Plaintiffs | : |
| v. | : |
| **CITY OF HARRISBURG and WANDA R. D. WILLIAMS,** | : |
| Defendants | : |

## MEMORANDUM

This civil action concerns efforts to host an annual event in the City of Harrisburg designed to raise awareness about climate change. The organizers of the event—known as the "Climate Convergence"—assert that they were and will continue to be subjected to unconstitutional and arbitrary conditions affecting their freedom of speech. According to the amended complaint, the city and its mayor, Wanda R. D. Williams, (collectively, "defendants"), wielded impermissibly broad and standardless discretion in violation of the First Amendment. Plaintiffs claim that these conditions burdened their 2022 event and forced them to abandon their plans in 2023. Absent injunctive relief, plaintiffs believe they will continue to suffer harm in connection with their planned 2024 event. Defendants filed a motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). We will deny the motion.

I.      **Factual Background & Procedural History**

Better Path Coalition Planning Group ("Better Path") is an unincorporated association of organizations that advocate for renewable energy solutions and decreased reliance upon fossil fuels in Pennsylvania. (See Doc. 60 ¶ 10). Karen Feridun—a resident of Berks County and member of Better Path—serves as a lead organizer for its annual Climate Convergence event, a "peaceful gathering organized to demand urgent action by our government to address the climate crisis." (See id. ¶¶ 11, 14 (citation omitted)). Better Path and Feridun (collectively, "plaintiffs") selected Harrisburg as the location of their event in 2022 and intended to march along city streets, near the capitol complex, and in Riverfront Park. (See id. ¶¶ 14, 16).

Harrisburg's city code contains one ordinance regarding the use of public spaces; it obliges certain groups to obtain a permit to use city parks. (See id. ¶ 18; see also Doc. 60-1, Code § 10-301.20(a)(2)). The code does not provide guidance or standards governing the use of city streets or sidewalks, though, and its provision with respect to parks lacks detail. (See Doc. 60 ¶ 4). Consequently, plaintiffs were unable to consult formally promulgated regulations, and instead navigated a "patchwork" of conditions imposed by city officials exercising "standardless discretion." (See id. ¶ 5). Three documents communicated these conditions, entitled "Special Event Permit Procedures," (see id. ¶ 24; Doc. 60-3); "Application for Special Event Permit," (see Doc. 60 ¶ 25; Doc. 60-4); and "Release and Waiver of Liability," (see Doc. 60 ¶ 26; Doc. 60-5). In terms of costs, defendants imposed unspecified service fees, shifted the cost of "traffic control" staff and equipment to

2

plaintiffs, and charged unspecified rental fees for metered parking spaces. (See Doc. 60 ¶ 27). Plaintiffs also note that defendants' forms contained an internal inconsistency regarding the required amount of insurance,[1] overbroad indemnification and waiver requirements, burdensome notice requirements, and an instruction to develop a traffic control plan. (See id.)

Plaintiffs encountered difficulties securing the required insurance because "carriers simply were unwilling to underwrite events of this type." (See id. ¶ 30). They sent a letter to Mayor Williams in March 2022 identifying "constitutional deficiencies" and requesting that she waive certain requirements. (See id. ¶ 31). Ultimately, defendants informally waived the insurance coverage and indemnification requirements, but maintained that plaintiffs would have to pay traffic control fees, parking space rental fees, and a permit fee for Riverfront Park; they would also have to obtain insurance for the portion of the event occurring in the park. (See id. ¶ 32). Plaintiffs initiated this lawsuit on April 29, 2022, after efforts at consensus reached this impasse. (See id.) They also filed a motion for a preliminary injunction. (See id. ¶ 34; Doc. 3).

Before we resolved plaintiffs' motion for a preliminary injunction, the parties entered into a settlement agreement. (See Doc. 60 ¶ 34). According to its terms, plaintiffs would only pay a $610 permit for use of Riverfront Park, a $480 traffic

---

[1] One form required $250,000 of insurance per person and $1,000,000 per any single occurrence, while another specified $1,000,000 in event liability coverage, $1,000,000 for auto liability coverage, and standard liability coverage. (See Doc. 60 ¶ 27).

control fee to close city streets, and a $96 "equipment usage fee" related to traffic control. (See id. ¶ 35). Because they continued to dispute the propriety of these charges—which totaled $1,186—plaintiffs placed that amount in escrow pending the outcome of this litigation. (See id. ¶¶ 35-36). They acquired insurance for their use of Riverside Park at a cost of $917, and the 2022 Climate Convergence took place "without incident." (See id. ¶¶ 36-37). It included a festival at Riverfront Park, a march through downtown Harrisburg, a brief rally, and a demonstration during which plaintiffs installed a climate countdown clock on the steps of the capitol and delivered petitions to elected officials. (See id. ¶ 37).

The settlement agreement also provided that defendants would work in good faith to clarify and alleviate some of the constitutional defects plaintiffs had identified. (See id. ¶ 36; see also Doc. 33). Nevertheless, defendants purportedly provided no such guidance in advance of the 2023 Climate Convergence event, causing plaintiffs to again spend significant time and resources navigating burdensome permitting requirements. (See Doc. 60 ¶¶ 40, 42). Defendants again required a permit fee for Riverfront Park and proof of insurance, and they imposed terms regarding indemnification and liability related to use of the park. (See id. ¶ 43). They did not seek to impose all the conditions discussed in 2022, (see id. ¶ 44), but plaintiffs encountered a new hurdle in 2023: defendants provided incomplete, informal, confusing, and dubious guidance regarding efforts to hang Climate Convergence banners on city-controlled utility poles. (See id. ¶ 49). Faced with these requirements, plaintiffs were forced to abandon their "chosen" public forums; they hosted the 2023 Climate Convergence at the capitol complex, which defendants

do not control.  (See id. ¶¶ 49-51).  As in 2022, the event took place "without incident."  (See id. ¶ 51).  Negotiations to reach a global settlement broke down, and plaintiffs filed an amended complaint on February 2, 2024.  (See id.; Doc. 58).

Plaintiffs plan to hold the 2024 Climate Convergence in Harrisburg on October 20 and October 21 of this year.  (See id. ¶ 52).  They allege that, in failing to enact an ordinance or otherwise cure constitutional defects in their regulatory scheme, defendants are engaging in unlawful prior restraint of core political speech, and otherwise burdening the First Amendment rights of individuals seeking to exercise them in traditional public fora.  (See id. ¶¶ 53-58).  They seek declaratory and injunctive relief, reimbursement of funds pursuant to 42 U.S.C. § 1983, and costs and attorneys' fees pursuant to 42 U.S.C. § 1988.  (See id. at 27-29 (prayer for relief)).  As noted, pending before the court is defendants' motion to dismiss.

## II.  Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  See FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly

5

authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

Defendants raise three distinct challenges to the amended complaint. Preliminarily, they argue that plaintiffs' action impermissibly relies upon conduct and statements made during compromise negotiations, in violation of Federal Rule

6

of Evidence 408, (see Doc. 66 ¶¶ 17-19; Doc. 68 at 14-17), and that plaintiffs' requested relief is either impossible to obtain without offending the separation of powers doctrine, unwarranted, or both, (see Doc. 66 ¶¶ 15-16; Doc. 68 at 11-14; Doc. 77 at 3-4). On the merits, defendants contend plaintiffs' First Amendment claims are meritless because the permitting scheme is a reasonable, viewpoint neutral time, place, and manner restriction. (See Doc. 66 ¶ 14; Doc. 68 at 6-11).

We decline to consider defendants' arguments invoking Rule 408,[2] or their invitation to focus on the availability of certain forms of relief.[3] Instead, we begin

---

[2] Defendants contend that unspecified averments and details in the amended complaint are derived from information that plaintiffs obtained during the parties' negotiations concerning the 2022 and 2023 events. (See Doc. 68 at 14-15). Pointing to the Federal Rules of Evidence, they assert that evidence arising out of negotiations aimed at reaching a compromise is not admissible "to prove or disprove the validity . . . of a disputed claim." See FED. R. EVID. 408(a)(2); but see Parallel Iron LLC v. NetApp, Inc., 84 F. Supp. 3d 352, 359-60 (D. Del. 2015) (defendant seeking to use settlement evidence to calculate fees, but not to prove merits of claim, did not violate Rule 408). Defendants also intimate that the court should strike, *sua sponte*, unspecified portions of the amended complaint pursuant to Federal Rule of Civil Procedure 12(f). (See Doc. 77 at 10). The court need not and will not consider defendants' Rule 408 arguments at this juncture, as even they recognize this is not the "procedurally appropriate time." (See id.) Rule 408 does not generally govern pleadings, which must comply with the distinct Rule 12(f) standard. See Horse Soldier, LLC v. Tharpe, No. 1:13-CV-2892, 2014 WL 5312823, at *7-8 (M.D. Pa. Oct. 17, 2014) (Conner, C.J.); Goldstein v. Elk Lighting, Inc., No. 3:12-CV-168, 2013 WL 790765, at *9-10 (M.D. Pa. Mar. 4, 2013). Plaintiffs correctly acknowledge that defendants fail to invoke Rule 12(f) in their motion and make no attempt to establish that the amended complaint contains "redundant, immaterial, impertinent, or scandalous matter." (See Doc. 74 at 20 n.10 (quoting FED. R. CIV. P. 12(f)).

[3] In short, defendants submit that plaintiffs seek to legislate *via* injunction. Defendants also suggest that plaintiffs' claim regarding parking space fees is "unintelligible" because they do not specify which metered parking spaces they would need, and because the city does not control all metered parking spaces within its borders. (See Doc. 68 at 3). On these points, we observe that it generally is "inappropriate" to assess the availability of various remedies before liability has

7

with their third argument, which concerns the plausibility of plaintiffs' constitutional claims. Plaintiffs allege that defendants violated their First Amendment rights and interfered with their ability to use three distinct fora: Riverfront Park, Harrisburg streets and sidewalks, and banners on city-owned utility poles. (See Doc. 60 ¶¶ 21, 32-33, 45-46). They assert that defendants subjected their proposed use of these fora to an "informal and disjointed" web of requirements riddled with constitutional deficiencies. (See id. ¶¶ 55-58). We therefore begin by briefly reviewing controlling case law regarding expression and the government regulation of public fora. See NAACP v. City of Philadelphia, 834 F.3d 435, 441-42 (3d Cir. 2016) (when evaluating restrictions upon speech occurring on public property, courts begin with forum analysis). Given that landscape, we address plaintiffs' claims relating to each forum *seriatim*.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. That prohibition is applicable to the states via the Fourteenth Amendment, see Thornhill v. Alabama, 310 U.S. 88, 95 (1940), and the First Amendment's protections are at their "zenith" when the speech at issue is political in nature, see Meyer v. Grant, 486 U.S. 414, 425 (1988). In suits concerning

---

been established. See Dicicco v. Citizens Fin. Grp., Inc., No. 15-267, 2015 WL 5302767, at *10 (E.D. Pa. Sept. 10, 2015) (quoting Devon Robotics v. DeViedma, No. 09-CV-3552, 2010 WL 300347, at *6 (E.D. Pa. Jan. 25, 2010)). Our focus is whether the amended complaint contains any "plausible claim for relief," not the specific relief requested. See Iqbal, 556 U.S. at 678.

an individual's interest in using property owned by the government or the public for their own expressive activity, a court must weigh that interest against the government's interests in limiting the property's use.  See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 573-74 (1987).  The United States Supreme Court has recognized three categories of fora—traditional public, designated public, and nonpublic—and has held that the appropriate level of scrutiny when analyzing First Amendment challenges depends upon the category at issue.  See id. at 572-73 (citing Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45-46 (1983)); United States v. Marcavage, 609 F.3d 264, 274 (3d Cir. 2010).

Defendants do not dispute that the fora at issue here are traditional public fora.  (See Doc. 60 ¶¶ 21, 53; Doc. 68 at 6-7).  Public streets and parks are the archetypal spaces "traditionally devoted to assembly and debate."  See Galena v. Leone, 638 F.3d 186, 198 (3d Cir. 2011) (citing Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998)).  Within this category, the government may subject speech to time, place, and manner restrictions so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) do not foreclose ample alternative channels for communication. See Ward v. Rock Against Racism, 491 U.S. 781, 791-803 (1989).

Notwithstanding the "heavy presumption" against prior restraints, it is well-settled that a state actor regulating and maintaining traditional fora for public use may adopt a permitting scheme to facilitate that use.  See Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992) (citing Bantam Books, Inc.

9

v. Sullivan, 372 U.S. 58, 70 (1963); Cox v. New Hampshire, 312 U.S. 569, 574-76 (1941)). To survive constitutional scrutiny, such a scheme must satisfy the foregoing three-part test and it cannot vest overly broad discretion in local officials. See id. (citing Freedman v. Maryland, 380 U.S. 51, 56 (1965)). A law that allows for arbitrary application or decisions based in "the exercise of judgment" or opinion is inconsistent with the First Amendment's guarantee; such wide latitude opens the door for censorship. See id. at 130-31 (citing Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 649 (1981); Cantwell v. Connecticut, 310 U.S. 296, 305 (1940); Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). By contrast, a law that provides "narrow, objective, and definite standards to guide the licensing authority" is a valid time, place, and manner restriction. See id. at 131 (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969)).

### A.     Riverfront Park

According to the amended complaint, defendants conditioned the use of Riverfront Park upon (i) a permitting fee of $620, and (ii) consent to sweeping indemnification provisions, as well as internally inconsistent, burdensome insurance requirements. (See Doc. 60 ¶¶ 26, 27, 43). Plaintiffs argue that the permitting fee did not result from any objective standard, schedule, or guidelines, (see Doc. 74 at 10-12), and that the indemnification and insurance requirements are neither content-neutral nor narrowly tailored, (see id. at 12-15). Defendants assert that the various requirements they imposed in relation to the use of public property for expressive activity do not inherently offend the First Amendment, see The Nationalist Movement v. City of York, 481 F.3d 178, 184 (3d Cir. 2007) (citing

10

Thomas v. Chi. Park Dist., 534 U.S. 316, 322 (2002)), but they misapprehend both case law and our standard of review in ways that are fatal to their arguments.

### 1. *Permit fee*

Defendants argue that plaintiffs have failed to state a claim concerning the permit fee, but they rely upon a reading of precedent that the United States Supreme Court has explicitly rejected. In Cox, the Court upheld a licensing scheme that required individuals who wanted to use a forum to pay "a sum not more than [$300] for each day" of an event. Cox, 312 U.S. at 571 n.1. Rejecting the argument that the First Amendment required a flat fee, the Supreme Court explained that local governments should enjoy "flexibility" in terms of "the adjustment of fees . . . in light of varying conditions." See id.[4]

Two years later, however, the Court in Murdock invalidated a much lower flat *per diem* license fee applied to individuals distributing religious literature. See Murdock, 319 U.S. at 106 (describing charges of $1.50 for one day, $7 for one week, $12 for two weeks, and $20 for three weeks). The Court distinguished Cox on the ground that the fee in Murdock was "*not a nominal one*, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." See Murdock, 319 U.S. at 116 (emphasis added). Half a century later, the Forsyth County Court clarified that the "nominal" nature of the fee in Cox was merely one of the grounds upon which the fee in

---

[4] Cox offered an example of this point, which our court of appeals distilled as follows: "[A] circus or other large parade can be assessed a larger fee than a small parade, because the former would cause a larger expense to the government than the latter." See City of York, 481 F.3d at 184 (citing, *inter alia*, Cox, 312 U.S. at 577).

11

Murdock was distinguishable; Murdock does not stand for the broader proposition "that an invalid fee can be saved if it is nominal, or that only nominal charges are constitutionally permissible." See Forsyth County, 505 U.S. at 137.

Defendants submit that the $620 permit fee is reasonable under Cox, and that it is not "arbitrary," but an example of exercising "flexibility [in the] adjustment of fees." (See Doc. 68 at 10). Adjusting for inflation, they argue, that sum is less costly than fees that have survived judicial scrutiny, and thus is reasonable *per se* in 2024. (See id. at 9; Doc. 77 at 8-9 (discussing Cent. Fla. Nuclear Freeze Campaign v. Walsh, 774 F.2d 1515, 1521 (11th Cir. 1985)). We disagree. Reading Cox as implicitly blessing a dollar amount that is facially tolerable to the Constitution necessarily would require us to ignore Forsyth County's lesson that no fees, not even "nominal" ones, are immune from constitutional challenge. Yet even defendants' own proffered authority—which predates Forsyth County's clarification—recognized that charging fees for the use of public streets is permissible "only when such fees are *both* nominal *and related to the expenses incidental to the policing of the event*." See Walsh, 774 F.2d at 1522 (emphasis added); contra Forsyth County, 505 U.S. at 137; City of York, 481 F.3d at 183.[5] Plaintiffs assert that the permit fee was assessed without reference to a standard or schedule, implicating dubiously broad discretion, and that it represents a "classic"

---

[5] In City of York, our court of appeals found that an application fee of $50 for residents and $100 for non-residents was both nominal and "narrowly tailored to allow the city to recoup the cost of processing the application." City of York, 481 F.3d at 183. Under defendants' construction, the second portion of that holding would be superfluous, because both $50 and $100 are smaller sums than $300.

12

example of prior restraint. (See Doc. 60 ¶¶ 18, 53); see also City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757 (1988) (statute "placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship") (citations omitted). Given the fee's uncertain provenance and the open question of whether it is narrowly tailored to the city's interests, plaintiffs have stated a plausible First Amendment claim.

### 2. *Insurance and Indemnification*

In a similar vein, defendants' arguments regarding insurance and indemnification fail. (See Doc. 68 at 11-13). Courts have upheld comparable requirements in certain instances and struck them down in others,[6] but we have not come across cases in which those questions were decided on the pleadings alone. Plaintiffs assert that defendants' indemnification requirement is overbroad in that it contemplates reimbursement for *any* damages, regardless of whether they were caused by event organizers, (see Doc. 60 ¶ 27); that the insurance requirement is indefinite because of an internal inconsistency, (see id.); and that these barriers to

---

[6] Compare E. Conn. Citizens Action Grp. v. Powers, 723 F.2d 1050, 1056 n.2 (2d Cir. 1983) (recognizing constitutional concerns when "brokers or underwriters . . . consider political beliefs of those who have applied for insurance coverage, the likelihood of adverse publicity to the insurance company, . . . and other invidious or irrelevant factors" in assessing applications for insurance policies), and Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont, 700 F. Supp. 281, 285 (D. Md. 1988) (considering possibility that spectators would be hostile for purposes of insurance condition impermissible under First Amendment), with Thomas v. Chi. Park Dist., 227 F.3d 921, 925 (7th Cir. 2000) (upholding condition where "the amount of insurance required [was] not . . . influenced by[] the nature of the event" but depended "only on the size of the event and the nature of the facilities"), aff'd Thomas, 534 U.S. at 325-26.

13

the use of a public forum chilled their protected First Amendment activity, (see id. ¶ 50). These allegations track with the logic of City of York, in which our court of appeals concluded that a reimbursement provision was unconstitutional because it made speakers financially responsible for costs not "rightfully associated with [the] event." See City of York, 481 F.3d at 185-86. The provision's broad language allowed local government officials to account for "the public's reaction to the speech," potential responses to counterdemonstrations, and the appropriate level of security, all of which "would necessarily require a consideration of the content of the proposed speech and the anticipated reaction of the public." Id.

The court will not engage in a premature analysis of legal questions without the benefit of a developed record. In the matter *sub judice*, the amended complaint identifies a governmental scheme that lacks definite standards and imposes overly broad preconditions to organizing a public event. Defendants suggest that their scheme is subject to a lower level of scrutiny in light of certain commercial or "festival" aspects of plaintiffs' plans. (See Doc. 68 at 9 (citing Thomas, 534 U.S. at 322)). The court construes this suggestion as a merits argument unsuitable for resolution at this stage. Accepting plaintiffs' allegations as true as we must, see Phillips, 515 F.3d at 233, they have plausibly alleged that defendants' insurance and indemnification requirements are burdensome in ways that interfere with their plans to use Riverfront Park for activities protected by the First Amendment.

    **B.    City Streets and Sidewalks**

Plaintiffs also claim that defendants charged various fees for the use of Harrisburg streets and sidewalks not controlled by the Pennsylvania Department of

14

Transportation or capitol police. (See Doc. 60 ¶¶ 17, 43). These charges included $480 for staffing, $96 for "equipment usage"—calculated as "20% of staff time"—and $44 per metered parking space located on the march route. (See id. ¶ 33; see also Doc. 60-7). They also assert that defendants asked for 90 days' notice and a "traffic control plan." (See Doc. 60 ¶ 34). These allegations are sufficient to state a plausible First Amendment violation as well.

State actors obviously may assess fees associated with the expense of holding an event. See City of York, 481 F.3d at 184. But what plaintiffs allegedly paid and expect to pay in the future are fees allegedly divorced from any definite standard or formal authority, imposed by local officials wielding sweeping discretion. The Constitution does not permit such standardless, unfettered oversight. See Forsyth County, 505 U.S. at 130 (quoting Shuttlesworth 394 U.S. at 150-51); City of Lakewood, 486 U.S. at 757. As for Harrisburg's streets and sidewalks, the amended complaint describes, *inter alia*, the inscrutable calculation of an "equipment use" fee; an *ipse dixit* minimum charge for personnel and staff time;[7] an unidentified sum for an indeterminant number of parking spaces; a lengthy notice requirement; and the obligation to develop a "traffic-control plan," but no guidance about how to create an acceptable one. (See Doc. 60 ¶¶ 33, 25, 27; see also Doc. 60-7). It is not

---

[7] Plaintiffs also claim that defendants initially demanded reimbursement for any additional officers—"over and above those covered by the initial $480 fee"—that might be dispatched, should the need arise. (See Doc. 60 ¶ 34(f) & n.5). Though plaintiffs acknowledge that defendants waived this requirement pursuant to the settlement agreement, (see id.), we note that this sort of open-ended fee bound up in the exercise of "judgment" and "opinion" without reference to objective standards generally is odious to the First Amendment, see Forsyth County, 505 U.S. at 130-31.

clear why equipment would be calculated as a percentage of staff time, or how local officials arrived at their "minimum" charges.

Aside from the fees themselves, defendants' laundry list of preconditions—and the challenges plaintiffs purportedly encountered in attempting to decipher and meet them—plainly implicates the sort of scheme that threatens to discourage the exercise of speech rights. See, e.g., Am.-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 606 (6th Cir. 2005) (finding city's 30-day advance notice requirement for special events not narrowly tailored to significant governmental interests); see also NAACP v. City of Richmond, 743 F.2d 1346, 1355 (9th Cir. 1984) ("The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely."). Defendants may, at an appropriate time, attempt to justify the reasonableness and narrow tailoring of these various requirements. But a motion under Rule 12(b)(6) is not the proper vehicle for making that determination. Plaintiffs' factual allegations raise their right to relief as it pertains to city streets and sidewalks "above the speculative level," Twombly, 550 U.S. at 555, and so we will deny defendants' motion in that respect.

### C. Banners

Defendants raise no specific arguments regarding their regulation of banners on city-controlled utility poles, which plaintiffs intended to hang to raise awareness of the 2023 Climate Convergence. We accept as true that plaintiffs spent "weeks . . . trying to decipher the process for obtaining a permit" to hang banners, that city

16

officials "stopped responding" and shuffled Feridun's inquiry to other offices, and that those officials spuriously claimed that the city does not issue such permits. (See Doc. 60 ¶ 49). As the United States Supreme Court has explained, the absence of guideposts for a government's treatment of speech allows for "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria." City of Lakewood, 486 U.S. at 758 (citations omitted). While it can be difficult for courts to assess the as-applied constitutionality of decisions made against this factual backdrop (or lack thereof), see id., we note that plaintiffs advance both as-applied and facial claims, (see Doc. 60 ¶ 55). We conclude that defendants' alleged reversal on availability of banners for public use, and the obscurity of the process to pursue their use, together raise the reasonable inference that the scheme facially violates the First Amendment.

**IV.    Conclusion**

We will deny defendants' motion to dismiss. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    August 19, 2024